Link: 89

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

GEMSTAR DEVELOPMENT
CORPORATION, ROVI
TECHNOLOGIES CORPORATION,
and UNITED VIDEO PROPERTIES,
INC.,

       Plaintiffs,

   v.

HULU, LLC,

       Defendant.

Case No. 12-cv-4756-MRP

**Order Denying Hulu's Motion for Summary Judgment That the '775 Patent is Invalid**

## I.    Introduction

The Plaintiffs (collectively "Rovi") have sued Hulu, LLC ("Hulu") for infringing U.S. Patent No. 7,769,775 (filed Aug. 20, 2007) ("the '775 patent"), entitled "Search Engine for Video and Graphics with Access Authorization." Hulu has moved for summary judgment of invalidity as to claims 1-9 and 12-18 of the '775 patent on the grounds of anticipation, obviousness, and non-enablement.

//

## II.    Technical Background

The claims in continuation patents are better understood in the context of the claims in corresponding parent patents. The '775 patent is a continuation of U.S. Patent No. 6,859,799 (filed Nov. 30, 1999) ("the '799 patent"), entitled "Search Engine for Video and Graphics." The '799 patent (the parent) claims methods involving the following general steps: (1) automatically generating identifiers by analyzing the area near a graphic or video file within a web page; (2) receiving a search query; and (3) executing the search based on the received query and the stored identifiers. '799 at 8:7-23. Claim 2 of the '799 patent recites various types of identifiers such as "format," "size," "play time," "whether conditional access or payment is required," etc. *Id.* at 8:24-33.

The '775 continuation patent homes in on one of these aforementioned identifiers – access authorization. The '775 claims generally involve: (1) automatically acquiring, without user input, information ***including access authorization information*** about a graphic or video file; (2) receiving a search query; (3) providing access to files ***not requiring authorization***; and (4) receiving further user instructions. The '775 claims differ from the '779 claims in two ways: (1) focus on access authorization; and (2) provision of access to content not requiring authorization. Because the disposition of this motion only requires an

analysis of independent claims 1 and 9, the Court forgoes a description of the numerous dependent claims mentioned in Hulu's motion.

### III.   Legal Principles

**A. Summary Judgment**

The Court shall grant summary judgment if: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The Court must: (1) identify material facts by reference to the governing substantive law, *Anderson*, 477 U.S. at 248; (2) disregard irrelevant or unnecessary factual disputes, *id.*; and (3) view facts and draw reasonable inferences in favor of the nonmoving party, *Scott v. Harris*, 550 U.S. 372 (2007).

The Court cannot grant summary judgment if the dispute about a material fact is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Faced with a properly supported summary judgment, the nonmoving party may not rest upon mere allegations or denials of its pleading but must set forth specific facts showing a genuine issue for trial. *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B. Anticipation**

To be anticipating under 35 U.S.C. § 102, a prior art reference must disclose each and every limitation of the claimed invention, must be enabling, and must describe the claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention. *See Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000). Anticipation "requires identity of invention: the claimed invention, as described in appropriately construed claims, must be the same as that of the reference, in order to anticipate." *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). Each limitation must be expressly or inherently described in a single prior art reference for that reference to be anticipating. *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002). Inherent anticipation requires that undisclosed limitations are *necessarily* – not merely probably or presumably – present in the prior art. *Trintec Indus.*, 295 F.3d at 1295.

If there is a genuine issue of material fact relevant to any one of these factors, summary judgment is not proper. If the record reveals no genuine dispute of material fact, summary judgment may be appropriate. *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008).

//

//

**C. Obviousness**

A patent claim is obvious when the differences between the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art . . . ." 35 U.S.C. § 103. The ultimate determination of whether an invention would have been obvious at the time the invention was made is a legal conclusion based on underlying factual inquiries including: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations of nonobviousness. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007) (citing *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18 (1966)). In an obviousness determination, the presence or absence of a motivation to combine references is also a pure question of fact. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

"[A] district court can properly grant, as a matter of law, a motion for summary judgment on patent invalidity when the factual inquiries into obviousness present no genuine issue of material facts." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir. 1991).

**D. Enablement**

A patent's specification must "enable any person skilled in the art to which it pertains . . . to make and use the same . . . ." 35 U.S.C. § 112, ¶ 1. The specification

1  must enable one of ordinary skill in the art to make and use the entire scope of the

2  claimed invention without undue experimentation. *See MagSil Corp. v. Hitachi*

3  *Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012); *Nat'l Recovery*

4  

5  *Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1196 (Fed. Cir.

6  1999). "Although the ultimate determination of whether one skilled in the art could

7  

8  make and use the claimed invention without undue experimentation is a legal one,

9  it is based on underlying findings of fact." *Warner-Lambert Co. v. Teva-Pharm.*

10  

11  *USA, Inc.*, 418 F.3d 1326, 1337 (Fed. Cir. 2005).

12      To determine whether the amount of experimentation is undue, the Federal

13  Circuit has articulated eight factors: (1) the quantity of experimentation necessary,

14  

15  (2) the amount of direction or guidance presented, (3) the presence or absence of

16  working examples, (4) the nature of the invention, (5) the state of the prior art, (6)

17  

18  the relative skill of those in the art, (7) the predictability or unpredictability of the

19  art, and (8) the breadth of the claims. *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir.

20  

21  1988) ("the *Wands* factors"). The party alleging invalidity bears the burden of

22  proving by clear and convincing evidence that the claims are invalid for lack of

23  

24  enablement. *MagSil Corp.*, 687 F.3d at 1380.

25              **IV.   Discussion**

26      The Court first resolves a preliminary claim construction dispute. Then, the

27  

28  Court addresses each of Hulu's invalidity arguments in turn.

**A. Claim Construction**

All asserted claims include[1] the claim expression "automatically [acquiring/acquire], without *user* input, searchable file information . . . comprising a field indicating whether each graphic or video file requires authorization to access." '775 cls. 1, 9. Rovi argues that "user" includes content providers. Opp. at 8. Hulu questions the need for any construction. Hulu's Reply at 4. The patent does not state that "user" *can only* mean "content viewer." The patent also does not state that "user" *could* mean "content provider." The Court must, therefore, review all instances of the word "user" in the specification (and in the claims which are part of the specification) to determine the class of entities covered by the claim term "user." Specifically, the analysis is whether content providers qualify as "users." Consequently, the Court rejects Hulu's suggestion to refrain from construing this claim term.

In the context of the described invention, certain instances of "user" in the patent specification are plain references to the content viewer:

1. "A search engine stores the location of a given piece of information and various descriptions of the information in a database that is searchable by a *user*." 1:32-34.

2. "The results of the search are sent or displayed for the *user*." 2:32-33.

3. "The process receives a request for video or graphic content from a *user*." 3:28-30.

---

[1] . . . by either express recitation or incorporation via dependence . . .

4. "[T]he process solicits the *user* for the authorization information or payment . . . ." 7:28-29.

On the other hand, other instances of "user" in the patent specification are plain references to the content provider:

1. "[T]he process solicits a *user* to submit information regarding a graphic or video file and then generates one or more tags to be inserted into the area surrounding the link to the graphic or video file." 6:25-29.

2. "Using the *user* provided information along with the location of the file, the process generates an identifier, and saves the identifier in a database." 6:37-39.

3. "[T]he process solicits a *user* to submit information regarding a graphic or video file and then generates a file that contains identifier information about the graphic or video file to accompany the graphic or video file." 6:39-43.

Common sense suggests that in the context of the described invention, the entity *submitting information* regarding a graphic or video file is likely the content provider. Not the content viewer. This conclusion finds support in the surrounding discussion in the specification regarding meta-tags, "Currently, meta-tags exist for describing a page of content, but additional specialized tags may be created to contain identifier information for other specific types of content." 6:29-32. The creators of meta-tags, typically, are content providers.[2]

---

[2] "Meta tags are a great way for webmasters [content providers] to provide search engines with information about their sites." Google's Webmaster Tools, available at http://support.google.com/webmasters/bin/answer.py?hl=en&answer=79812 (last accessed on January 17, 2013).

-8-

Like the specification, the claims also contain numerous instances of "user" that point to different entities depending on context:

1. "receiving a *user* selection of a particular graphic or video file . . . ." 8:28-29.

2. "receiving a *user* instruction to perform a file function on the particular graphic or video file . . . ." 8:32-33.

3. "performing the file function in response to receiving the *user* instruction." 8:36-37.

In the context of the patented invention, the Court finds that the "user" claim limitations above refer to *only* the content viewer because only the viewer ordinarily selects files and submits instructions.

But in the claim expression "automatically [acquiring/acquire], without *user* input, searchable file information . . . comprising a field indicating whether each graphic or video file requires authorization to access," the Court finds that the "user" limitation plainly refers to the content *provider*. For the *provider* of a media file's access authorization information is likely the content *provider*, not the content *viewer*. "User," therefore, refers to content providers who input access authorization information relating to their own content. And the patented invention relieves providers of this burden by automating the acquisition of access authorization information.

It is plausible to picture a scenario where *content viewers* submit information regarding a graphic or video file and the search engine *updates* one or more tags

-9-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

with each incremental submission.[3, 4] But the '775 specification does not disclose this scenario. The Court has a duty to construe claim limitations *in light of* the specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("Claims must always be read in light of the specification."). Consequently, the Court finds that "user" in the expression "automatically [acquiring/acquire], without ***user*** input," refers only to the content provider.

## B. Anticipation

The asserted claims require acquisition of access authorization information ***without*** input from the content provider. Hulu's Magnifi[5] reference fails to anticipate the '775 claims because it acquires access authorization information ***with*** input from the content provider in the form of a mediaX file stored[6] "within the [same] directory where the media file resides." '892 4:10-11.[7] The "***without***

---

[3] It would, in fact, be quite desirable to devise a system where the function for search relevancy includes, as one of its parameters, the feedback of other searchers. User comments on news articles and YouTube videos are examples of searcher-generated content that an engine could use to index, generate identifiers, and improve search relevancy.

[4] Google's "+1" widget on web pages is a good example of a *content-viewer-driven* improvement of search relevancy. Though not equivalent to a "submission of information" in the descriptive sense, a "+1" click can certainly improve search relevancy and could even be used to generate non-descriptive identifiers. *See* "Will Google +1 Really Improve Search Relevancy?" available at http://www.gazelleinteractive.com/will-google-1-really-improve-search-relevancy/ (last accessed on January 17, 2013).

[5] U.S. Patent No. 5,903,892 (filed Apr. 30, 1997) ("the '892 patent").

[6] The Court finds that the content provider creates and stores the mediaX file. The Magnifi specification suppots this finding: "Since the mediaX file is stored directly within the directory where the media file resides, it ensures an implicit authentication process whereby ***the content provider*** can enhance the searchable aspects of the multimedia information and can do so in a secure manner." '892 at 4:10-15 (emphasis added).

[7] The Court notes that the content provider's initial act of uploading media files and web pages to web servers is not in and of itself "user input" with respect to access authorization information. Post-publication acts such as (1) the provision of mediaX files within the same directory as the media file or (2) a content provider's submission of "information regarding a graphic or video file," '775 6:37, are examples of user input. The scope of "input" is not the subject of current dispute between the parties. Since claim construction is not an exercise in redundancy, the

-10-

user input" limitation is neither necessarily present nor inherent in Magnifi's "*with user input*" technique of using content-provider-generated mediaX files. Inherency, therefore, does not apply here.

## C. Obviousness

As a first step, the Court makes factual determinations (Graham factors) relevant to the obviousness inquiry. Next, the Court determines the legal question of obviousness.

### 1. Factual Determinations (Graham Factors)

"[T]he obviousness inquiry requires examination of all four *Graham* factors." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012). The Graham factors include (i) the scope and content of the prior art; (ii) the level of ordinary skill in the art; (iii) differences between the claimed invention and the prior art; and (iv) objective indicia of nonobviousness. The Court examines each factor in turn.

### i. The scope and content of the prior art

The person having ordinary skill in the art ("PHOSITA") is deemed to be aware of all relevant prior art within the field of invention and any analogous technical fields. *See* Joseph P. Meara, *Just Who is the Person Having Ordinary Skill in the Art? Patent Law's Mysterious Personage*, 77 WASH. L. REV. 267

---

Court refrains from construing "input" or giving unsolicited guidance on its scope. For the purposes of this motion, it suffices to say that a content provider's creation and storage of a mediaX file within the same directory as the media file *is* user input – rendering Magnifi non-anticipating.

(2002). To determine whether the claimed invention is obvious over the prior art from the vantage point of the PHOSITA, the Court must review the corpus of prior art relevant to obviousness. Understanding the extent of the disclosure in each and every prior art reference – and, for that matter, a determination of what is missing – is critical to the obviousness analysis.

### a.  U.S. Patent No. 5,903,892 (filed Apr. 30, 1997) ("Magnifi"). Turner Decl. Ex. C.

The Magnifi patent describes a method and apparatus for searching for multimedia files in a distributed database and for displaying results of the search based on the context and content of the multimedia files. *See* Magnifi at Abstract. Magnifi describes a technique for acquiring identifiers using a special file (mediaX) stored in the same directory as the media file. *Id.* at 3:60-4:15. Magnifi also describes techniques for analyzing textual information surrounding the media reference on a webpage. *Id.* at 5:3-18.

While the mediaX file could contain access authorization information, it is the result of the input of the content provider. The Magnifi patent, therefore, does not disclose acquiring, without user input, information relating to access authorization.

### b.  Shih-Fu Chang et al., *Exploring Image Functionalities in WWW Applications – Development of Image/Video Search and Editing Engines*. Turner Decl. Ex. D.

The Chang article identifies key technical challenges in image/video applications on the internet and presents two prototype systems: (1) a video search

engine called WebSEEk; and (2) a compressed video editor (WebClip). WebSEEk uses "Web URL addresses and HTML tags associated with the images and videos, from which it extracts key terms for direct indexing and classification of the visual content." Chang at 2. These key terms are used to map images and videos into one or more of the subject classes in WebSEEk's semantic ontology, which contains more than 2,000 classes and uses a multi-level hierarchy. The construction of classes is semi-automatic in that human assistance is required in the design of the "basic" classes, following which "additional candidate classes are suggested by the computer and verified with human assistance." *Id.* To the extent WebClip extracts information, it relates to visual content. *Id.* at 3. While "Authentication, Watermarking, and Conditional Access" are mentioned in this paper, the only subsequent discussion is limited to the statement, "The second topic is concerned with techniques facilitating a trustable environment in which the rights of consumers, content providers, and content distributors are all protected." The paper focuses on the first topic, i.e. "development of image/video search . . . ." *Id.* at 1.

The Chang article does not disclose acquiring, without user input, information relating to access authorization.

//

//

//

-13-

**c.  Haitao Jiang & Ahmed K. Elmagarmid, *WVTDB – A Semantic Content-Based Video Database System on the World Wide Web*. Turner Decl. Ex. E.**

The Jiang article describes the design and implementation of a web-based video database system (WVTDB). The article describes the system architecture in detail, Jiang at 948-50, and describes video data modeling in such a system. *Id.* at 950. The article next discusses how the video database is populated, *id.* at 955, and how the video is annotated and indexed. *Id.* at 956. "Video annotations . . . can come from various sources, including closed caption, manual annotation, text recognized by OCR techniques, and voice recognition, etc." *Id.* "Such video annotations usually contain relatively objective information about the video," e.g., "film name, director's name, actors and actresses' names, closed caption text, etc." *Id.* The article next discusses user queries and video browsing. *Id.* at 958-59, 961.

The Jiang article has a section entitled "Access Control and User Profiling." *Id.* at 962. The article discusses the challenges related to the "schemaless" nature of video databases. *Id.* "In the WVTDB system, a video database access control mechanism based on the VideoText model is used." *Id.* at 962. Using the VideoText model, one can control access to individual video frames or to the whole video stream. *Id.* "The basic idea is to attach the access control information to each logical video segment and thus achieve arbitrary control granularity." *Id.*

The article discusses three kinds of database users: (1) video database administrator (DBA) who has full access rights to the database; (2) advanced users who can create their own logical video streams, segments, and annotations, and can decide access permission on these data; and (3) ordinary users with read only permission. *Id.* at 962. The article discloses two levels of data access: (1) system level control on the whole video database by the DBA; and (2) user level control on the logical video segments by advanced users. *Id.* "Physical access data control is solely determined by the DBA." *Id.* at 962-63. "Each physical video segment is tagged with a list of groups or users that are denied read access." *Id.* at 963. "Each logical video segment is attached with its access control information which can be updated by authorized users." *Id.* The article notes that even a user *with* read permission can be denied the ability to retrieve the actual physical data. In other words, says the article, "the DBA makes the final decision on access." *Id.* When discussing indexing, the article notes that "[i]deally, the system should process the video data and extract . . . descriptors automatically to serve as video indexes." *Id.* at 964. The article acknowledges the limitations of existing image processing and computer vision techniques with respect to indexing and notes that video browsing architecture does not address the issue of video indexing. *Id.*

The Jiang article does not disclose acquiring, without user input, information relating to access authorization.

**d.  Boon-Lock Yeo & Minerva M. Yeung, *Retrieving and Visualizing Video*. Turner Decl. Ex. F.**

The Yeo article discusses a digital video database management system (VDBMS) with an emphasis on special functions and advanced features unique to a VDBMS. "Database management involves the management of video data" including "search and indexing techniques." Yeo at 45. In a section entitled "Access control and rights management," the article states that "Access control is needed to protect the database from unauthorized access and the data against malicious use and attacks." *Id.* at 46. "[A]ccess authorization can be provided at the data-object level by data encryption and digital watermarking technologies . . . ." *Id.* The article next discusses automated extraction of characteristics of video data, starting with the detection of transitions from one shot to another, *Id.* at 47, and the extraction of audiovisual features (image-based features, motion-based features, etc.). *Id.* at 49.

The Yeo article does not disclose acquiring, without user input, information relating to access authorization.

**e.  Lippman & R. Kermode, *Media Banks: Entertainment and the Internet*. Turner Decl. Ex. G.**

The Lippman article discusses two models for delivering video: video-on-demand and the internet. The article discusses the development of a "Media Bank," a process generally involving (1) an indexing and storage scheme, (2) a suite of

-16-

client programs to access data, and (3) a delivery protocol. Lippman at 275.
Indexing involves separation of meta-data about the video object from the actual
data. The article mentions various examples of meta-data including length of the
clip, its resolution, its compression format, and information needed for indexing
and retrieval. *Id.* at 276. The article also describes various benefits of using meta-
data (reduction of overhead, flexibility from the user's perspective, and flexibility
from the content provider's perspective).

When discussing the benefits of meta-data to content providers, the article
acknowledges that "[c]ontent providers have major concerns regarding access to
their products." *Id.* at 277. "[C]ontrolling access to the bits of an object is
important because it controls consumption of the object and hence enables the
content provider to charge for the privilege of access." *Id.* But at the same time,
content providers want consumers "to consume and reuse the bits as often as
possible." *Id.* The article criticizes the then-current broadcast model's solution to
these conflicting goals by stating, "As soon as a newspaper leaves the press or a
television show is aired, access to the original material and editing decisions ***is lost***
and the material is ***rendered opaque for repurposing***." *Id.* (emphasis added).

The article describes overcoming these problems by proposing a model which
derives a new object by combining "select pieces" of the proprietary object "that
remains secure on the content provider's own server." *Id.* "Should a client wish to

use this new object, the client still has to access the content provider's secure servers for the object data, and pay the appropriate royalty or access fee for the privilege." *Id.*

The Lippman article does not disclose acquiring, without user input, information relating to access authorization.

### f.  Theodore Zahariadis et al., *Interactive Multimedia Services to Residential Users*. Turner Decl. Ex. H.

As its title suggests, the Zahariadis article addresses problems relating to the delivery of media from the perspective of a residential user. The article first addresses the requisite system's architecture. Zahariadis at 62 ("Reference System Configuration"). When discussing the various entities involved in a section titled "Service Requirements," the article lists "the content provider, who will be furnishing various content, and categorizing *and indexing* it . . . ." *Id.* at 63. Another section entitled "Access Validation" recognizes that "[i]n a future interactive environment, where almost all advertisements could be skilled, accounting based on access validation seems to be the only viable and acceptable way of billing the provision of the new services under discussion." *Id.* "Access validation is not only a matter of billing. It also supports authentication and authorization of users . . . ." *Id.*

When discussing "User Authentication/Authorization," the article identifies three categories of users per unit of customer premises equipment (CPE): (1) the

-18-

CPE manager, (2) the CPE users, and (3) anonymous users. *Id.* "The CPE manager will . . . have authorization to enable, disable, or change the CPE users' permissions for each service. The CPE users will have the ability to use any of the applications they are authorized to use and customize their service environment." *Id.* When discussing mobility in the next section, the article describes the necessity of unique personal identification numbers. *Id.* at 64. Next, the article describes the need for one-stop-shop-style billing so that a user gets one bill for all purchases. *Id.* at 64-65.

The Zahariadis article does not disclose acquiring, without user input, information relating to access authorization.

### g. U.S. Patent No. 5,956,716 (filed Jun. 7, 1996) ("Kenner"). Turner Decl. Ex. I.

The Kenner patent describes a video clip storage and retrieval system. Kenner at Abstract. Upon request, a user receives comprehensive data in the form of selected video clips coupled with corresponding database information collected from one or more databases. *Id.* at 4:35-42. In one embodiment, Kenner discloses an invention related to access authorization. Here, "the user establishes an account with a content provider or ISP. This account may be in the form of a subscription, a debit account, [etc.] . . . When the user accesses ***subscribed-to content*** through the system, the user can be billed for usage in any manner desired, subscription

information can be tracked and preserved, authorization levels can be set, and data protection to prevent unauthorized use can be accomplished." *Id.* at 6:17-26.

Kenner, therefore, describes a technique of access authorization based on the sufficiency of *a user's* subscription rights. *Id.* at 6:45-47 ("If the regional database can match the video ID to a clip existing on a local server, *and the user's subscription rights are sufficient*, then the clip will be downloaded from the local server."); *see also id.* at 21:43-45 ("The PIM 64 maintains information on the subscriber in a user database, namely the types of content subscribed to, user preferences, limitations on service, and billing information."). The PIM-based access authorization system disclosed in Kenner, therefore, is user-centric and not media-file-centric. Indeed, an entire section of Kenner is devoted to "*Subscription Control and Management*" and discusses access authorization from the perspective of the *subscriber*, not the media file. "To receive access to the [Kenner] invention, the end user must subscribe to the premium service." *Id.* at 33:38-39.

Kenner describes a media-file-centric embodiment of access authorization where a video ID is constructed, in part, from the content provider's account number as provided by the organization running the subscription service. But the video ID is passed to the PIM which then "checks the user's subscription rights in its user database, and if authorized and necessary, initiates a . . . process to download the desired clip to the user's terminal." *Id.* at 24:15-18. "[T]he PIM has a

user database which stores information on each of its users, namely subscription rights, authorized rating levels, accrued charges, charge limits, etc." *Id.* at 24:47-50.

The Kenner patent, therefore, does not disclose acquiring, without user input, information relating to access authorization.

### h.  John R. Smith & Shih-Fu Chang, *Visually Searching the Web for Content*, Turner Decl. Ex. K at 156.

The Smith article describes WebSeek, a prototype image and video search engine designed to allow efficient and effective search and retrieval of images and videos. Smith at 12. The Smith web crawler performs a breadth-first search to look for images and videos on the internet. *Id.* at 13. The system analyzes filename extensions to categorize content by type (e.g., image, video, HTML). *Id.* The web crawler (or "spider") extracts visual features that allow for content-based searching, browsing, and grouping; extracts other attributes such as width, height, number of frames, and type of visual data; and generates an icon to represent the visual information to be used for browsing and displaying query results. *Id.*

The Smith article recognizes that "text provides clues about the semantic content of the visual information" and accordingly extracts, using delimiters, terms from the URL or the "alt" text corresponding to a media file. *Id.* at 14. The rest of the article discusses content-based techniques based on color histograms and spatial locations and arrangements of color regions. *Id.* at 17.

The Smith article does not disclose acquiring, without user input, information relating to access authorization.

### i. Budi Yuwono & Dik Lun Lee, *WISE: A World Wide Web Resource Database System*. Turner Decl. Ex. R.

The WISE paper describes a database containing meta-information built using an indexer robot. The robot "only retrieves objects of text format . . . ." Wise at 550. It avoids "nontextual and application-specific objects which it is not capable of processing." *Id.* The paper discloses four ranking algorithms: (1) TFxIDF; (2) Most-cited; (3) Binary-vector spread activation; and (4) Weight-vector spread activation. *Id.* at 550. The paper expresses confidence in the viability of search strategies which "take advantage of WWW-specific meta information such as semantics of hyperlinks . . . ." *Id.* at 554.

The WISE paper does not disclose acquiring, without user input, information relating to access authorization.

### j. U.S. Patent No. 5,136,655 (filed Mar. 26, 1990) ("Bronson"). Turner Decl. Ex. S.

The Bronson patent discloses a technique for processing audio-video data in a storage medium where indexes are generated by automatically extracting and indexing words and pictures in the audio-video data with their corresponding timing or other location data. "A voice recognition subsystem identifies words while a pattern recognition subsystem identifies pictures." Bronson at 1:44-45.

"[T]he voice recognition subsystem 28 is used to compile word data 35, a base of recognizable words from the audio portion of the audio-video data, together with their individual location data." *Id.* at 3:10-13. "The word data is then indexed and stored in a data index." *Id.* at 3:14-15. "The pattern recognition subsystem 38 would be used to identify scene changes or other events of interest to create scene data 40." *Id.* at 4:14-16. "The scene data 40 would then be made available to microcomputer 30 via the data index bus 36 from storage within the data index 34." *Id.* at 4:24-26.

The Bronson patent does not disclose acquiring, without user input, information relating to access authorization.

### k.   Howard D. Wactlar et al., *Intelligent Access to Digital Video: Informedia Project*. Turner Decl. Ex. T.

The Wactlar paper recognizes that "[w]ithout suitable indexing, a collection of video material cannot serve as an information resource." Wactlar at 47. The paper discloses a variety of indexing methodologies including (1) unlimited-vocabulary, speaker-independent, connected-speech recognition; (2) object presence; (3) object and scene in 3D; and (4) natural-language processing.

The Wactlar paper does not disclose acquiring, without user input, information relating to access authorization.

//

//

1
2

**l.  Charles Frankel et al.,** *WebSeer: An Image Search Engine for the World Wide Web***. Turner Decl. Ex. U.**

3

4

"WebSeer uses the textual information surrounding an image and the image

5

6

header to supplement the information derived from analyzing the image content."

7

WebSeer at 2. "Image analysis algorithms are then used to classify the image

8

within a taxonomy of types . . . and to extract useful semantic information." *Id.*

9

WebSeer exploits the structured nature of HTML documents and seeks relevant

10

information in file names, captions, alternative tabs, titles, hyperlinks, and other

11

12

text. *Id.* at 3-4. It derives further information *directly* from the image content such

13

as grayscale or color, image size, file type, file size, and file date. *Id.* at 4. While

14

the authors describe current work as including "[i]ncreasing the number of

15

16

categories for classifying images," the article does not explicitly identify access

17

authorization as one such category. *Id.* at 15.

18

The WebSeer paper, therefore, does not disclose acquiring, without user input,

19

20

information relating to access authorization.

21

**m. Andrew Laursen,** *Oracle Media Server: Providing Consumer Based Interactive Access to Multimedia Data***. Turner Decl. Ex. V.**

22

23

24

The Laursen article describes the Oracle Media Server which provides a

25

26

platform for distributed client-server computing and access to data over

27

asymmetric real-time networks. Laursen at Abstract. The Laursen article does not

28

disclose acquiring, without user input, information relating to access authorization.

n.   **Jayanta K. Dey Sircar et al.,** *Providing VCR Capabilities in Large-Scale Video Servers*. **Turner Decl. Ex. W.**

The Dey Sircar reference proposes an alternative to conventional fast-forward and rewind features called "the effective FF/Rew service mechanism." Dey Sircar at 2. This reference does not disclose acquiring, without user input, information relating to access authorization.

o.   **T.D.C. Little & D. Venkatesh,** *Prospects for Interactive Video-on-Demand*. **Turner Decl. Ex. X.**

The Little reference surveys technological considerations for the design of a large scale distributed *interactive* multimedia system. Little at Abstract (emphasis added). After surveying the various types of interactive services, the article lists system components for video-on-demand. *Id.* at 7. When discussing "Schemes for Query Support and Information Retrieval," the article identifies the utility of an indexing mechanism and notes the difficulty of creating indices due to the unstructured nature of information. *Id.* at 13. The authors note that "[t]his leads us to the realization that there exists a need to extend image content queries to the video itself. However, a detailed discussion of this topic is outside the scope of this paper." *Id.* The article discusses various benefits of using meta-data, i.e., data about data, but does not flesh out the topic further.

The Little paper does not disclose acquiring, without user input, information relating to access authorization.

-25-

### ii.    The differences between the claimed invention and the prior art

The primary difference between independent claims 1 and 9 of the '775 patent and the corpus of the prior art is that the independent claims are directed to automatically acquiring access authorization information *without user input*. The prior art references, on the other hand, fail to identify the very *problem* of acquiring authorization information without user input.

### iii.    The level of ordinary skill in the art

The Court finds that "a person of ordinary skill in the art at the time of filing of the '775 patent would have been an engineer with a Bachelor's Degree in Electrical Engineering or Computer Science (or equivalent field), with around two to four years of relevant experience with the technical aspects of digital video (and particularly video search and analysis) or equivalent learning and experience." Kramer Decl. at 3.

### iv.    Secondary considerations

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the Court *may* defer consideration of the motion or deny it, allow time to obtain affidavits or declarations or to take discovery, or issue any other appropriate order. FED.R.CIV.P. 56(d).

Rovi argues that "with further discovery it will be able to show additional evidence that the accused Hulu products have been commercially successful, at least in part due to the infringing use of the '775 technology." Opp. at 22. Rovi complains that Hulu has not produced important categories of discovery such as financial information and 30(b)(6) witness that are important for discovery and presenting this evidence. *Id.* In its Reply, Hulu points out that "[t]his matter has been pending for over 1.5 years" and that it would be "inappropriate at this point to delay summary judgment further to allow Rovi more time to scour for evidence it should have already obtained." Reply at 22. Hulu further argues that "[e]ven if Rovi found that Hulu practiced the claims and that Hulu is commercially successful, Rovi would still need to identify a nexus between that success and the esoteric concept of 'automatically acquiring searchable file information' to the exclusion of other factors." *Id.*

### 2. Legal Determination (Obviousness)

As Hulu recognizes, "the question central to obviousness is whether 'there existed at the time of invention ***a known problem*** for which there was an obvious solution encompassed by the patent's claims." Mot. at 15 (citing *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 420 (2007). For obviousness, the "proper analysis requires a form of amnesia that 'forgets' the invention and analyzes the prior art

and understanding of the problem at the date of invention." *Mintz v. Dietz &*

*Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).

The Court finds that the prior art fails to acknowledge, let alone understand, the collective action problem[8] involved with requiring individual content providers to input access authorization information. The '775 patent solves this problem by directing automated indexing techniques to the task of acquiring, without input from each content provider, an access authorization identifier. "Often the inventive contribution lies in ***defining the problem*** in a new revelatory way. In other words, when someone is presented with the identical problem and told to make the patented invention, it often becomes virtually certain that the artisan will succeed in making the invention." *Id.* at 1377. (emphasis added). This is one such case. The '775 patentee's inventive contribution lies in recognizing the applicability of automatic indexing techniques to solving the collective action problem.

Once a reasonably skilled artisan with knowledge of the entire corpus of prior art is *presented with* the problem, i.e., that each content provider is saddled with the burden of inputting access authorization information – the '775's claimed solutions might be self-evident.[9] But therein lies the '775 patentee's non-obvious

---

[8] "It's a huge collective action problem to get everybody on the Internet to adopt the file format, even if you're doing it as part of a standards body; never mind if you patent the thing first." Transcript at 81:4-7 (Rovi's counsel discussing the problems inherent in Magnifi-type inventions which require content providers to collectively adopt a standard structured file format, e.g., mediaX).

[9] Indeed, at oral argument, Rovi's counsel identified certain implementations of the disclosed invention using techniques of text-parsing to automatically acquire, without user input, access authorization information. "For

inventive contribution – the definition of the problem in a new revelatory way. Claim 1, taken as a whole, identifies and solves this previously-unrecognized collective action problem.  As do independent Claim 9 and the remainder of the dependent claims.

At oral argument, counsel for Hulu stated,

> In effect, the '775 patent discloses the broad universe of information that you can ingest and use to search. The '775 patent tried to claim a single one of those items. There's **no reason** to permit that simply because the Magnifi patent also disclosed an additional technique to get that information which, by the way, contrary to Mr. Roberts' argument, was not an exclusive technique. The Magnifi patent is very clear that all of its techniques for obtaining information can be used individually or together. And, in fact, the preferred embodiment uses them together. So anything that was available on an HTTP page undisclosed in the '775 patent to those inventors was equally available in the Magnifi Web crawler and would have been equally absorbed because it explicitly describes absorbing all the information in the surrounding Web page, crawling over the links and getting information associated with the links and ingesting all of it; so there's **no meaningful distinction** between what's in Magnifi and what's in the '775.

Transcript at 85:11-86-3 (emphasis added).

The Court disagrees with Hulu's argument. Not a single piece of prior art identified the problem of automatically acquiring, without user input, access authorization information. The '775 did. In fact, the '775 patent homed in on the problem; the same problem that the prior art failed to recognize, let alone understand. That is reason enough to find that Hulu has failed to put forth clear and

---

example, if you search a file and it has a button on the page that says 'log in,' that is an indication from the text that it requires authorization to access the file. If the file is on an HTTPS, a secure website, that is an indication that it is behind a pay wall." Transcript at 81:13-18.

convincing evidence of obviousness in a way that overcomes the '775 patent's presumptive validity. Notwithstanding the impressive detail of Magnifi's disclosure regarding text-parsing techniques of automatic indexing without user input, the prior art corpus' fatal deficiency with respect to obviousness analysis is its failure to recognize, let alone understand, the collective problem solved by the '775 patent. There is a meaningful distinction between "what's in the Magnifi and what's in the '775" – the '775's patent claims which are part of its specification contain an important and meaningful distinction – the solution to the collective action problem. Each claim, as a whole, purports to solve the collective action problem. This is the rare case where the non-obvious contribution of the inventor is evidenced in the patent claims which define a novel problem in a revealing way and propose a solution. This approach is consistent with the basic tenet of obviousness analysis – an examination of the differences between the "subject matter sought to be patented," i.e., the patent claims, and the prior art.

"[Hulu] must prove by clear and convincing evidence that a person of ordinary skill . . . at the time of the invention would have recognized the . . . problem recognized by the inventors and found it obvious . . . to solve that problem" using the claimed invention. *Mintz*, 679 F.3d at 1377-78. Hulu has not met this burden because none of its prior art references have identified the *problem* the '775 patent addressed. In its obviousness analysis, the Court cannot define the problem with

reference to the '775 patent and then determine if the claimed solution was obvious to a person having skill in the art at the time of the invention. Using the patent-in-suit to formulate a statement of the problem represents a form of prohibited reliance on hindsight. *Id.* at 1377.

The Court further finds that Hulu's scattered references[10] to "common sense" exemplify precisely what the Federal Circuit has cautioned against:

> The mere recitation of the words 'common sense' without any support adds nothing to the obviousness equation. Within the statutory test to determine if a claimed invention has advanced its technical art field enough to warrant an exclusive right, 'common sense' is a shorthand label for knowledge so basic that it certainly lies within the skill set of an ordinary artisan. With little more than an invocation of the words 'common sense' (without any record support showing that this knowledge would reside in the ordinarily skilled artisan), the district court overreached in its determination of obviousness.

*Id.*

To be sure, secondary considerations played a significant role in the Federal Circuit's obviousness analysis in *Mintz*, 679 F.3d 1372, whereas they are absent in the record before the Court. Still, the prior art's lack of recognition of the problem that the '775 patent solves (automatically acquiring access authorization information without user input) suffices for the Court to find that Hulu has not presented clear and convincing evidence to overcome the presumption of validity attaching to the '775 patent.

---

[10] "[T]he prior art, *not to mention common sense*, already provided the motivation to provide conditional access systems . . . ." Mot. at 23 (emphasis added). "The '775 Patent's obviousness is also apparent from Magnifi in light of the knowledge of ordinary skilled artisans (as evidenced by multiple prior art references) *and common sense*." Reply at 1 (emphasis added).

**D. Enablement**

Hulu argues that the '775 specification fails to explain how the system automatically acquires access authorization information *without* user input. Mot. at 24. The '775 specification recites the following disclosures:

1. "To acquire identifier information, the process searches the ***content*** surrounding the graphic or video on the content provider's computer." 5:39-42 (emphasis added).

2. "[T]he process generates identifiers . . . by . . . reading . . . associated ***text*** surrounding any links to the video stream and graphic . . . ." 5:47-50 (emphasis added).

3. "The process also searches through web sites that contain video streams or graphics, and using pointers in such web sites that open or click to the video stream or graphic or web page containing the video stream or graphic, and 'reverse locates' any ***text*** description of the video stream." 5:52-56 (emphasis added).

4. "[W]hen a link is used to open a video stream, the process automatically searches to find all of the web pages where the link is contained, whether from the same web site as the video or graphic file or other web site. Once a link . . . is found, the process searches in the 'neighborhood' around the link to acquire relevant ***text*** information." 5:65-67, 6:1-3 (emphasis added).

5. "The ***text*** in the 'neighborhood' or area around the link is likely to contain descriptive and informational terms of interest. The closer to the link, the more likely the ***text*** is to contain relevant information. ***Text*** within the same paragraph, column, or general page area as the link, is likely to contain some information that can be placed into a searchable identifier." 6:4-9 (emphasis added).

6. "When more than one web page is found that contains links to the video or graphic, a comparison is performed on the 'neighborhood' ***text*** from the various web pages and terms or phrases that appear on more than one web page. Such terms in common are given more weight in the identifier for the video stream. Further, the more of these web pages that include the same

terms, the more weight is given to these terms in the identifier." 6:10-17 (emphasis added).

Most of the above disclosures describe techniques of acquiring generic identifier information from the text[11] surrounding[12] the media file, i.e., without input from the content provider (user). The disclosures do not limit the applicability of the above techniques to the acquisition of any particular identifiers. On one occasion, the specification uses open-ended language when discussing the types of identifiers amenable to automated acquisition, "In a preferred embodiment of the present information, text parsing techniques are used to identify relevant lines of text to incorporate into the textual description and other textual fields *such as [1] date of creation, [2] size, or [3] category* of the video in the identifier." The phrase "such as" opens up the possibility that access authorization information belongs in that list of identifiers. Another portion of the specification confirms that access authorization is an identifier "such as" the date of creation, size, and category of the video. *See* '775 patent at 3:61-67, 4:1-12 (including access authorization in a list of whole video identifiers, where the list also included date of creation, size of video, category of video).

"The specification need not explicitly teach those in the art to make and use the invention; the requirement is satisfied if, given what they already know, the

---

[11] The only exception is the first disclosure which describes using "content" surrounding the graphic or video.

[12] . . . or in the neighborhood of . . .

-33-

specification teaches those in the art enough that they can make and use the invention without 'undue experimentation.'" *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003). Hulu bears the burden of submitting clear and convincing evidence that a person having reasonable skill in the art would have been unable – at the effective filing date – to employ the above mentioned text-parsing techniques to determine whether a video or graphic file required conditional access or payment. Not only has Hulu failed to meet that burden, Hulu has put forth *no* evidence relating to the abilities of a skilled artisan in possession of the '775 patent. In fact, Hulu has only mentioned the word "experimentation" in its summary judgment briefs a sum total of *two* times. Mot. at 24, Reply at 23. In both instances, Hulu merely recites the statement of the law relating to enablement. *Id.*

Hulu is effectively asking the Court to find that the '775 is invalid for lack of enablement *regardless* of the level of experimentation required on part of the skilled artisan armed with the '775 patent. Put another way, Hulu must be arguing, without saying so, that *any* level of experimentation is *undue* in light of the '775 patent's failure to teach how to automatically acquire access authorization information without user input. That is a legitimate request; but it requires a showing that the '775 lacks *basic* enabling disclosure such that the level of knowledge of the art at the time of filing is irrelevant to the enablement analysis.

-34-

*See Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997) (characterizing the rule that a specification need not disclose what is well known in the art as a "rule of supplementation;" finding that the rule of supplementation is no substitute for a "basic enabling disclosure").

The '775 patent does not lack *basic* enabling disclosure. This is not a complex chemical patent. The specification contains sufficient description of text-parsing methods to automatically acquire, without user input, a variety of identifiers. Supra at 11-12. The patentee could have provided an example demonstrating the automatic acquisition of an identifier without input from the content provider. But the patentee's failure to do so is not fatal. Furthermore, the nature of the experimentation called for in the field of art relevant to the '775 patent involves *implementing* disclosed text-parsing techniques using code and experimenting with the goal of algorithmically determining various identifiers without input from the content provider – not mixing chemicals in a lab.[13] On this basis, this case is distinguishable from *Genentech, Inc.* where the Federal Circuit found a lack of enablement based on a lack of *basic* enabling disclosure. 108 F.3d at 1361.

At oral argument, counsel for Hulu stated, "[T]o the extent you find the '775 patent is enabled, it has to be based on the exact same disclosure that's in the Magnifi patent and, therefore, the Magnifi patent anticipates." Transcript at 74:13-

---

[13] This finding rests on the reasonable assumption that innovation in the chemical arts is generally more involved (both technically and financially) than that in the software field. *See generally* Orin S. Kerr, *A Theory of Law*, 16 GREEN BAG 2D 111 (2012).

16. The Court disagrees. If a prior art reference anticipates, it must expressly or inherently disclose each and every limitation of the claimed invention *and* it must enable one of ordinary skill in the art to make the invention without undue experimentation. *See Impax Labs., Inc. v. Aventis Pharm., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008) (describing the enablement standard of anticipatory references); *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000). Put another way, if it anticipates, it must enable. Hulu mistakenly asserts the converse, i.e., if it enables, it must anticipate. To satisfy the enablement requirement, "the specification need not explicitly teach those in the art to make and use the invention; the requirement is satisfied if, given what they already know, the specification teaches those in the art enough that they can make and use the invention without 'undue experimentation.'" *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1334 (Fed. Cir. 2003). "An inventor need not . . . explain every detail since he is speaking to those skilled in the art." *In re Howarth*, 654 F.2d 103, 105 (C.C.P.A. 1981). But an inventor in a prior art reference *must* inherently or expressly recite *every* claim limitation for that reference to anticipate a patent.

At oral argument, counsel for Rovi illustrated an implementation of automatically acquiring, without user input, access authorization information. "For example, if you search a file and it has a button on the page that says 'log in,' that

is an indication from the text that it requires authorization to access the file. If the file is on an HTTPS, a secure website, that is an indication that it is behind a pay wall." Transcript at 81:13-18. In rebuttal, Hulu's counsel noted, "Now, I heard a reference to something that he [Rovi's Counsel] made up of log-in buttons and HTTPS links . . . The '775 patent has no such disclosure." That the patent has "no *such* disclosure" does not mean the patent fails the enablement requirement. Gaps between the disclosure and the claimed breadth are acceptable so long as the specification enables a person skilled in the art to practice the claimed invention, i.e., fill in the gaps, without "undue experimentation." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). Perhaps Hulu's argument bears on a *separate* requirement of patent validity not now before the Court. *See Ariad Pharm., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1341 (Fed. Cir. 2010) (*en banc*).

## V.    Conclusion

Hulu's summary judgment motion of invalidity pertains to claims 1-9 and 12-18 of the '775 patent. Of these, only claims 1 and 9 are independent. The rest depend on either claim 1 or claim 9. In the interest of judicial economy, the Court has limited its obviousness and anticipation analyses to only the two independent claims. For an independent claim's novelty and non-obviousness transmits to its dependents which contain further limitations. *See Hartness Int'l, Inc. v. Simplimatic Engineering, Co.*, 819 F.2d 1100, 1108 (Fed. Cir. 1987) ("[T]he

district court was correct in holding that independent claim 1 was nonobvious. *A fortiori*, dependent claim 3 was nonobvious (and novel) because it contained all the limitations of claim 1 plus a further limitation."). Under enablement, Hulu's only challenges are as to claim limitations present in independent claims 1 and 9. The Court's enablement determinations as to claims 1 and 9, therefore, attach to the remainder of the claims relevant to Hulu's motion.

Accordingly, the Court rejects Hulu's motion for summary judgment of invalidity as to claims 1-9 and 12-18 of '775 on the grounds of anticipation, obviousness, and non-enablement.

IT IS SO ORDERED.

DATED: January 22, 2013

_____
Hon. Mariana R. Pfaelzer
United States District Judge