Link: 85

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

GEMSTAR DEVELOPMENT
CORPORATION, ROVI
TECHNOLOGIES CORPORATION,
AND UNITED VIDEO
PROPERTIES, INC.,

      Plaintiffs,

    v.

HULU, LLC,

      Defendant.

Case No. 12-cv-4756-MRP

**Order Denying Hulu's Motion for Summary Judgment That the '906 Patent is Invalid**

## I.    Introduction

The Plaintiffs (collectively "Rovi") have sued Hulu, LLC ("Hulu") for infringing U.S. Patent No. 7,103,906 (filed Sep. 29, 2000) ("the '906 patent"), entitled "User Controlled Multi-Device Media-on-Demand System." Hulu moves for summary judgment of invalidity as to claims 1-3, 6, 8, 10, and 11 ("the

Asserted Claims") of the '906 patent for anticipation and obviousness. The Court denies Hulu's motion.

## II.    Technical Background

The '906 patent describes methods for consuming media on different devices. An example of media is a television program. Claims 1 and 10, for example, enables a viewer to "pause the program he is viewing on one device, and *resume* watching the program from the place he left off on a different device – even if the second device is different in kind from the first, and even if the device requires the file to be in a different format to be viewed." Opp. at 1. The patent keeps track of where the viewer paused the program by using bookmarks. The patent delivers media to a device in a format compatible with properties of the client device. These properties can include device type, acceptable media format, and communications link speed and reliability. '906 at 5:27-29. Hereinafter, the Court refers to this step as "the delivery of format-compatible media."

## III.    Legal Principles

### A. Summary Judgment

The Court shall grant summary judgment if: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The

Court must: (1) identify material facts by reference to the governing substantive law, *Anderson*, 477 U.S. at 248; (2) disregard irrelevant or unnecessary factual disputes, *id.*; and (3) view facts and draw reasonable inferences in favor of the nonmoving party, *Scott v. Harris*, 550 U.S. 372 (2007).

The Court cannot grant summary judgment if the dispute about a material fact is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Faced with a properly supported summary judgment motion, the nonmoving party may not rest upon mere allegations or denials of its pleading but must set forth specific facts showing a genuine issue for trial. *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B. Anticipation**

To anticipate under 35 U.S.C. § 102, a prior art reference must disclose each and every limitation of the claimed invention, must be enabling, and must describe the claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention. *See Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000). Anticipation "requires identity of invention: the claimed invention, as described in appropriately construed claims, must be the same as that of the reference, in order to anticipate." *Glaverbel Societe Anonyme v.*

*Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). Each limitation must be expressly or inherently described in a single prior art reference for that reference to be anticipating. *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002). Inherent anticipation requires that undisclosed limitations are *necessarily* – not merely probably or presumably – present in the prior art. *Id.* at 1295.

If there is a genuine issue of material fact relevant to any one of these factors, summary judgment is not proper. If the record reveals no genuine dispute of material fact, summary judgment may be appropriate. *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008).

**C. Obviousness**

A patent claim is obvious when the differences between the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art . . . ." 35 U.S.C. § 103. The ultimate determination of whether an invention would have been obvious at the time the invention was made is a legal conclusion based on underlying factual inquiries including: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations of nonobviousness. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007) (citing *Graham v. John Deere*

*Co. of Kan. City*, 383 U.S. 1, 17-18 (1966)). The presence or absence of a motivation to combine references in an obviousness determination is also a pure question of fact. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

"[A] district court can properly grant, as a matter of law, a motion for summary judgment on patent invalidity when the factual inquiries into obviousness present no genuine issue of material facts." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir. 1991).

## IV.   Discussion

Hulu makes two invalidity arguments: (A) anticipation; and (B) obviousness:

### A. Anticipation

Hulu's anticipation arguments involve two prior art references: (i) U.S. Patent No. 6,760,758 ("Lund"); and (ii) U.S. Patent No. 6,166,730 ("Goode").

#### 1.  Lund

Lund recognizes that people are increasingly turning to mobile devices like cell phones for internet access. Such devices have small screens. The smallness of these screens enhances their portability. But this comes at a tradeoff in terms of usability. For example, reading a lengthy multi-page news article featuring an embedded video is difficult on a cell phone. But cell phones are handy for browsing the headlines that one could mark for later review. Lund optimizes usability in such a scenario by normalizing content display by device type. Lund

achieves this by creating a hierarchy of subsets of the underlying information. The spectrum of subsets can range, for example, from snippets, e.g., just the headlines, to the entirety of the information, e.g., the news article with multimedia. An intermediate subset could, for example, be the news article without multimedia. Lund publishes smaller subsets to small-display devices and larger subset to large-display devices. Lund enables a user to mark information such as headlines on a cell phone so as to later retrieve the full news article on a desktop.

The Court finds that Lund does not anticipate claims 1 and 10 of the '906 patent for two independently sufficient reasons. Lund fails to disclose: (a) bookmarking; and (b) format-compatible media delivery.

### a. Lund fails to disclose bookmarking.

A digital video is like a book of images. As books are sequences of ordered pages, videos are sequences of ordered images. Each page contains rows of alphanumeric characters. Each frame contains rows of pixels. Readers consume a book page-by-page. Viewers of videos consume a video file frame-by-frame. Bookmarks point to page numbers in books and frame numbers in digital videos. Readers pause reading at a particular page. Viewers pause viewing at a particular frame. Inserting a bookmark at the page where the reader stopped reading relieves the reader of the burden of flipping to that page, which also involves keeping track of that page. Likewise, inserting a digital bookmark at the frame number where the

viewer paused a video relieves the viewer of having to fast-forward to that frame number, which also involves keeping track of the frame number.

Lund discloses a placeholder, not a bookmark. Page numbers and frame numbers are positions within books and digital videos respectively. The Lund placeholder, by contrast, references an entire *object* – a subset of which is reproduced depending on the nature of the device. The difference is not one of degree; it is one of kind. Lund discloses a browser-cookie-based implementation[1] of its placeholder-based invention where a user fills out part of a form using one device and seamlessly finishes filling out the remaining part on another device. "For example, the user could begin filling out a form using a PCS phone, and then continue later using a personal computer." '758 at 8:35-37. But this is neither an express nor an inherent disclosure of tracking the specific *position* within the previously-filled form and subsequently resuming the second form-filling session *from that position*. This is another example of a placeholder which designates the entirety of an object, i.e., the form. Here, the designated object is a partially populated form.

---

[1] Hulu incorrectly uses the word "bookmark" in its brief to describe server-side cookies. *Compare* Mot. at 21 ("The control logic records a **bookmark** that indicates when a user has interrupted an application, such as filling out a form on a mobile phone, and allows [sic] the user to resume where he or she left off, but on a different device, such as a personal computer.") *with* 8:26-42 ("Advantageously, **cookies at the server** . . . ."). Even if server-side cookies are similar to browser bookmarks, both are distinct concepts from **book**marks in their functionality. Both are designations of objects in their entirety, not references to positions *within* objects. Conceivably, cookies could store anchor-tag data referencing positions *within* an html file, i.e., within a webpage. *See Add Anchor Tags to Jump to Specific Location on a Page*, available at http://help.typepad.com/anchor-tags.html (available at January 29, 2013). This would effectively serve as a marker of position *within* a form and come closer to the mark with respect to the '906 bookmark. But no such disclosure is express or inherent in Lund.

Hulu characterizes Lund's form-fill embodiment by stating, "The control logic records a bookmark that indicates when a user has interrupted an application, such as filling out a form on a mobile phone, and allows [sic] the user to **resume where he or she left off**, but on a different device, such as a personal computer." Mot. at 21. The bolded assertion is wrong because the user on the personal computer, now working on the previously-partially-populated form, must manually advance the cursor to the position *within* the form "where he or she left off." This might involve scrolling the page down to that position, i.e., the equivalent of fast-forwarding a video or flipping through pages of a book.

The Court finds that Lund does not disclose a bookmark. On this basis alone, Lund fails to anticipate claims 1 and 10.

### b.  Lund does not disclose format-compatible media delivery.

The '906 claims require "delivering . . . media . . . configured in a format compatible with identified **device properties** of . . . client device." The '906 specification explains that "**properties** of the client **device** . . . can include device type, acceptable media format and communications link speed and reliability." '906 at 5:27-29. Format compatibility in this context refers, at least in part, to technical compatibility, e.g., whether the delivered media is of the appropriate file-type.

The specification confirms this finding elsewhere,

i. "[T]he MODS 100 can store delivered media in a variety of formats, wherein each format is compatible with a particular type of client access device. For example, the MODS 100 may store particular delivered media in MPEG1, MPEG2, Digital Video Broadcast, Quicktime, etc." '906 at 6:16-20.

ii. "[I]f the device type . . . can process delivered media in the WML protocol . . . the MODS 100 can transcode the delivered media from the default format to WML." '906 at 6:30-35.

iii. "Suppose the client device 620-1 can only accept the presentation of delivered media in QuickTime format. As such, IMA 620-1 can convert the MPEG2 format . . . into QuickTime format compatible with the client device 620-1." *Id.* at 11:5-9.

By contrast, Lund states:

Mobile devices with very small screens are increasingly being used to retrieve information from the Internet. This information might include news headlines, e-mail messages, stock quotes, and directory information. While short pieces of information can be effectively retrieved in this way, as the information becomes longer, the small screen interface is ***no longer practical***. Thus, reading a news headline and abstract, or a name, phone number and address of a business might be appropriate; but the full news story or the longer ad copy for the business will often ***not make sense*** to read with a small screen while moving from place to place.

For the foregoing reasons, there is a need for a system and method for coordinating access to a network from a plurality of user devices that allow a user to access information as needed in a ***format*** appropriate for the particular device being used.

Lund at 1:18-33.

As the bolded words above indicate, Lund references a different notion of format compatibility than the '906 patent. Lund's format compatibility is about practical usability – not technical functionality. Another portion of the Lund

specification further confirms this finding. There, Lund states that after a user

selects an appropriate placeholder from a list:

> The user will be able to retrieve the marked information in **an appropriate format** for the device being used to access the network. **That is**, on a handheld device, a title and/or abstract may be an **appropriate subset**. On the other hand, when retrieving the information indicated by a placeholder with a personal computer, it may be **more appropriate to display** all of the information. That is, the term "subset" is not limited to proper subsets, and a suitable subset may be all of the information available.
> *Id.* 7:45-56.

Again, the Lund specification confirms that format compatibility is not related to technical functionality – rather to practical usability. Under Lund, a large subset is inappropriate for a small-display device – not because the larger subset is in an incompatible format with respect to the display device, but because it is not "appropriate" for practical usability. Hulu is incorrect in arguing that Lund addressed "the very same problem addressed in the '906 patent." Mot. at 15. Lund's format compatibility refers to practical usability whereas the '906 claims refer, at least in part, to a more technical notion of compatibility.

The Court finds that Lund fails to anticipate the '906 because it does not deliver format-compatible media.

//

//

//

//

-10-

1

### 2.  Goode

The Goode reference is best described with the Figures 10 and 12 from the specification:



Figure 10 of the Goode reference is reproduced above. Tracing the flowchart along the highlighted route discloses the following sequence of events: (1) after having previously paused (or stopped) a movie on a first set-top box, the "user selects [the movie's] title from [a] menu" (1005) in the second set top box; (2) the system detects that an "open session exists" (1010, YES) for the selected movie; (3) system determines that another set top box, for example, the previous set top

box, is *not* actively "using [the] open session" (1020, NO); (4) the second set top

box "begins [the] movie at [the] *last viewing position* (1030) (emphasis added).



**FIG. 12**

Likewise, in Figure 12 of the Goode reference, the right half of the flowchart

(1205, 1210, 1215) discloses the following sequence of events: (1) user selects a

title from an active program menu (1205); (2) the system determines that the user

is not watching the selected title on another set-top box, (1210, NO); and (3) the

system "begins [the] movie at [the] last viewing position" (1215). The '906 patent

requires format-compatible media delivery. The flowcharts in Figures 10 and 12

lack this requirement.

The Goode specification states:

The user uses his remote to select the title previously viewed on the first set top terminal. The second set top terminal sends a message to the VSM indicating the selected title. The VSM receives the message, looks into memory for the current position of the title, and sends a message to the video server to begin playing the title at the position stored in memory. ***The video server begins to play the video and the user views the title from the position they last stopped the movie*** . . . [T]he term "***set top terminal***" . . . is defined broadly to mean ***any device capable of performing the subscriber equipment functions*** described herein, such as receiving information from an information server and transmitting information to an information server. For example, a set top terminal may comprise a device mounted within or without a television or display device, a chip set or application specific integrated circuit (ASIC) or general purpose computer(s) or other device(s) programmed or adapted to function as an information receiver and/or transmitter.

'730 at 19:30-38, 20:8-18. (emphasis added).

Thus, whereas the '906 method claims require a step of <u>delivering format-compatible media</u> to set-top terminals, the Goode specification only discloses a step of <u>delivering media</u> to set top terminals. Thus, Goode fails to expressly anticipate claims 1 and 10 of the '906 patent.

Hulu cites the Goode specification to conclude that the digital video modulator packetizes video data into a format appropriate to the client device and its communication link, i.e., delivery of format-compatible media. For support, Hulu cites two excerpts from the Goode specification:

**Goode at 10:55-58**: "The configuration database 412 describes how the hardware is configured, e.g., which DVMs are active or standby, available frequencies, terminal configuration information, DVM information and the like."

-13-

**Goode at 7:12-18**: "As mentioned with respect to the server description, the circuit cards of the video session manager 106 may contain a packetizer 206 (shown in phantom) such that the server provides time division multiple access system streams and the DVM packetizes the information into transport packets complying with MPEG-2 or some other transport protocol, i.e., a packet division multiple access data stream."

The above statements only provide support for the first half of Hulu's conclusion, i.e., "[t]he DVM packetizes video data . . . ." The second half of Hulu's conclusion, i.e., "[t]he DVM packetiz[ing] video data *into a format appropriate to the client device and its communication link*" does not follow from the cited specification excerpts. The specification describes the DVM as "packetizing the information into transport packets complying with MPEG-2 or some other transport protocol, i.e., a packet division multiple access data stream." Mere compliance with packet division multiple access protocols like MPEG-2 does not, by itself, ensure delivery of format-compatible media; it only ensures delivery of media in a particular popular format which could end up being incompatible with the terminal device.

For example, a terminal device using QuickTime Player could be incompatible with MPEG-2 and would require a special step such as installation of a codec file.[2] In fact, the '906 patent itself describes a codec-type solution where the input is MPEG-2 but the device requires QuickTime. '906 at 11:5-9 ("Suppose the client device 620-1 can only accept the presentation of delivered media in QuickTime format. As such, IMA 620-1 can convert the MPEG2 format . . . into QuickTime format compatible with the client device 620-1."). The Goode reference's directive to packetize data as MPEG-2 without first (or ever) determining the terminal device's MPEG-2 compatibility confirms that Goode fails to recite format-compatible media delivery.

That is not to say that the Goode invention would not work. If the terminal device happens to support the packetized data's format, e.g., MPEG-2, the video playback would be successful. But if the terminal device was MPEG-2 incompatible, an intermediate step of converting the data into a compatible format would be necessary. This, Goode lacks. The logical explanation for this omission in Goode could be, as Rovi's expert contends, that "there is no need for identifying device properties prior to media transmission in Goode because the device

---

[2] *See, e.g.*, How to Convert MPEG-2 to MOV and Play MPEG-2 in QuickTime?, available at http://www.bigasoft.com/articles/how-to-convert-mpeg2-to-mov-and-play-mpeg2-in-quicktime.html (last accessed on January 30, 2013) (discussing MPEG-2 incompatibility with QuickTime and proposing installation of a codec as a potential solution); How to Convert MPEG2 to WMV video, available at http://www.mp4converter.net/tips/convert-mpeg2-to-wmv.html (last accessed on January 30, 2013); Power DVD DX do not play MPEG2 audio, available at http://forums.afterdawn.com/thread_view.cfm/675108 (last accessed on January 30, 2013).

properties are all the same *because the devices are all supplied by the cable company in the first place*." Kramer Decl. at 12.

The Court next addresses the applicability of the doctrine of inherent anticipation. As a matter of logic, the delivery of format-compatible media is not an inevitable result stemming from the delivery of media. For logic allows for the delivery of an incompatible file to a client device. But inherency is a question of fact. *Finnigan Corp. v. Int'l Trade Com'n*, 180 F.3d 1354, 1362 (Fed. Cir. 1999) ("Whether a claim limitation is inherent in a prior art reference for purposes of anticipation is . . . a question of fact."). As such, Hulu must prove by clear and convincing evidence that in the context of the Goode disclosure, delivery of media itself renders it inevitable that the delivered media will be in a format compatible with the client device type, the communication link, etc.

Hulu argues that the Goode set-top boxes are not necessarily identical and could differ from each other, and "where they differ, they would necessarily require individualized formatting." Reply at 16. Hulu illustrates its point with the graphic:

[T]he term "**set top terminal**" as used herein is defined broadly to mean **any device** capable of performing the subscriber equipment functions ... **For example**, a set top terminal may comprise a device mounted within or without a television or display device, a chip set or application specific integrated circuit (ASIC) or **general purpose computer(s) or other device(s) programmed or adapted to function as an information receiver and/or transmitter**.

FIG. 1

Put another way, Hulu is arguing that Goode allows for the scenario where the first set-top terminal is a traditional cable box but the second set-top terminal is some other device such as a personal computer. The very possibility of this scenario, Hulu argues, proves that media delivery necessarily entails individualized formatting. The '906 claims cover delivering media in a format compatible with certain properties of the terminal device, including acceptable display format, communication link speed and reliability, device type, etc. Hulu's theory under inherency rests on a questionable assumption that the mere usage of different types of set-top terminals assures delivery of media compatible with parameters such as communication link speed, communication link reliability, and acceptable device format. There is no disclosure of a step for accounting for these variables. Perhaps no accounting step is necessary because, as Rovi's expert stated, "*the devices are all supplied by the cable company in the first place*." Kramer Decl. at 12. Hulu has

not met its burden of proving, by clear and convincing evidence, facts pointing to inherency.

Thus, Goode does not anticipate claims 1 and 10 of the '906 patent. For Goode recites delivering media; not the <u>claimed</u> act of delivering format-compatible media. Delivering format-compatible media is not an inevitable result of delivering media – rendering inherency inapplicable. The Court therefore finds that Goode does not anticipate independent claims 1 and 10 of the '906 patent.

## B. Obviousness

The obviousness inquiry requires resolution of questions of fact and law.

### 1.  Factual Determinations: *Graham* factors

The *Graham* factors include: (a) the scope and content of the prior art; (b) the differences between the prior art and the claims at issue; (c) the level of ordinary skill in the pertinent art; and (d) secondary considerations of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The Court addresses each in turn:

#### a.  The scope and content of the prior art

The Court has described the Lund and Goode references in its anticipation analysis. Supra at 5-16. In addition to Lund and Goode, Hulu has submitted the following prior art references:

*//*

i.      **U.S. Patent 5,922,045 (filed July 16, 1996) ("Hanson")**

The Hanson patent discloses an invention which provides a bookmark that permits a user who is reviewing audio program material to stop at any point in the program and to resume the review at the point at which the user previously stopped. *See* Hanson at 1:66-2:2 (summarizing the Hanson invention). This, unlike the Lund placeholder, *is* the conceptual equivalent of '906 bookmark. "By providing a bookmark for the audio services the user can better access and utilize audio books, multi-step programs such as stop-smoking programs, audio soap operas, travel direction services, or any ***serial*** presentation of information that lends itself to self-pacing by the user." Hanson at 2:26-30.[3] The Court could not phrase it better. "[S]erial presentation of information . . . lends itself to self-pacing by the user" and demands a stop-and-go playback of media content.[4] Without a bookmark, users desiring stop-and-go playback would have to either: (1) listen through previously-consumed audio content; or (2) manually fast-forward to the exact point where they previously left off.

---

[3] The Hanson specification also discloses variable creation of bookmarks, i.e., placing bookmarks corresponding to various "steps" in a multi-step-quit-smoking audio program, or various "chapters" or "pages" in an audio-book, etc. *See* Hanson at 4:52-5:2 (discussing variable creation of bookmarks).

[4] The similarity between the Hanson bookmark disclosure and the '906 bookmark also highlights why the Lund bookmark, also known as a placeholder, is conceptually distinct. The Lund placeholder does not empower users interested in self-paced consumption of a ***serial*** presentation of information. Lund enables the user to more efficiently consume content by marking certain content for subsequent ***initial*** consumption. By contrast, Hanson and the '906 patent enable the user to ***resume previous*** consumption from the point of last consumption.

Rovi acknowledges that Hanson disclosed recording bookmarks to mark the user's position in an audio program. Opp. at 4. But Rovi emphasizes that in Hanson, the user accesses this program "***over the telephone.***" *Id.* To the extent Rovi's emphasis on the phrase "over the telephone" is intended to convey that the *exclusive* transmission medium of audio content is a telephone line, it is somewhat misleading. The Hanson specification states that "the present invention is not limited to user telephones over a PSTN. ***Any kind of network*** that will support audio services can be an appropriate transmission medium for the audio service from the platform to the user (for example, a wireless network)." Hanson at 6:25-29 (emphasis added). Put another way, Hanson's invention is network-agnostic. As Rovi acknowledges, Hanson identifies possible bandwidth constraints and suggests a solution involving downloading the program material to a user's personal computer first. Opp. at 4. But where bandwidth constraints are not a limiting factor, Hanson's disclosed invention remains network-agnostic. In fact, dependent claims in Hanson expressly recite non-telephone claim limitations for their networks such as a data network in Claim 3 and a wireless communication channel Claim 5.

Hanson's data-retrieval model is premised on identifying the user. But Hanson does not disclose any type of reformatting of audio content depending on the terminal device. Nor does Hanson hint at disparity in audio compression

standards or file formats for the audio files. As such, Hanson does not disclose delivery of format-compatible audio to a *different* second device over a *different* communication link. Also, Hanson's disclosed invention (both in the specification and claims) is limited to audio data.

The Court finds that Hanson discloses bookmarks but does not disclose the delivery of format-compatible media.

### ii.     U.S. Patent No. 6,289,346 (filed Mar. 12, 1998) ("Milewski")

The Milewski invention "relates to a method and apparatus for searching for archived items of interest and bookmarking those items for future reference." Milewski at 1:5-7. The Milewski bookmark, as Hulu notes, allows a viewer to "access the archived program at a particular point of interest in the program for future reference." *Id.* at 1:58-2:19. The Milewski bookmark is implemented in a different way than the '906 bookmark. In Milewski, the bookmark is in fact a "unique URL . . . specified for each segment of the archived program." *Id.* 2:9-10. By contrast, the '906 implements bookmarks by storing "a location in the delivered media related to a position in the delivered media . . . most recently . . . transmitted to the client device." '906 at 8:2-4. The '906 specification also discloses bookmarks which store a position *preceding* the most recently transmitted position "so that the resumption of delivery of the delivered media at a later time can

overlap the delivered media previously transmitted to the client device." *Id.* at 8:9-12.

### iii.  O. Sandsta et al., *Design and Implementation of the Elvira Video Server* ("EVS")

EVS describes an improved video technology suitable for advanced video applications. EVS at Abstract. The article identifies VCR support, frame accurate access, interactivity, multiple formats, virtual productions, editing, and tertiary storage as foundational requirements for the design of the server. *Id.* at 262.

As to the requirement of multiple formats, the article acknowledges that "[d]ifferent applications have different requirements to the format of the delivered video. The video server should be able to store and deliver the same video document compressed by different compression standards, e.g., MPEG or Motion JPEG – and different qualities – e.g., different resolutions and frame rates – while still treating this is *one* logical video document with respect to the rest of the database." *Id.*[5] Likewise, the '906 MODS server is also described as storing "delivered media in a variety of formats, wherein each format is compatible with a particular type of client access device . . . MPEG1, MPEG2, Digital Video Broadcast, Quicktime, etc."). '906 at 6:16-20.

---

[5] "To support representation of multiple media formats for every logical *Video Document*, there can exist one or more *Video Streams*. A *Video Stream* represents a particular media format of the *Video Document*. We can thus have the *Evening News* of *29.5.96* in both MPEG-1 and JPEG compressed format for supporting different video players while still regarding this as one video document." *Id.* at 264.

EVS describes a request-driven protocol for video delivery. Instead of shouldering the responsibility of delivering the appropriate video to the appropriate client, EVS's "request driven protocol puts great responsibility **on the clients** for buffer management and synchronization of the video presentation." *Id.* at 266. EVS states, "The advantage of this request driven approach is that it puts more relaxed requirements on the server for synchronization of the video deliverance." The '906 patent also discloses a request-driven implementation where "the client device 110 can transmit the device type indication with the initial access request. Hence, the client device type can be identified with a minimum of communications required." '906 at 6:41-45.

But the '906 patent also teaches other protocols in addition to request-driven protocols. For example, the '906 patent teaches a server which converts media to a format compatible with the identified device properties of the client device. *See, e.g.*, '906 at 3:7-10 ("In the intermediate server, the media can be converted to a format compatible with the identified device properties of the first client device"); '906 at 6:25-30 ("[W]hen a request for delivered media is received from a client device having a particular device type, the MODS 100 **can identify the device type and transcode or convert** the delivered media from the default format to a format compatible with the identified device type."); 6:40-42 ("[T]he MODS 100 **can**

*send* an initial query to the client device 110 requesting that the client device 110 report its device type.").

>    iv.    John R. Smith et al., *Transcoding Internet Content for Heterogeneous Client Devices* (**"Transcoding Internet Content"**)

The Transcoding Internet Content article proposes a network-based transcoding system to improve the accessibility of a wide range of client devices to the content on the Internet. The introduction to the article states, "[M]echanisms within the HTTP protocol allow the client to specify some client attributes, such as the preferred language of the user, or the image, video, and audio *formats* supported by the client device." *Id.* at Introduction. "Using this information, the content server can automatically select and deliver content that is *compatible with the client device* and the user." *Id.*

The system described in the article "retrieves and analyzes the Internet content and ingests it into the InfoPyramid format. A policy engine *gathers the capabilities of the client, the network conditions, and the transcoding preferences of the user and publisher. This information is used to define the transcoding options for the client*. The system then selects the output versions of the content and uses a library of content analysis, filtering, translation, and manipulation routines to generate the content to be delivered to the client device.

*Id.* at 1.



Figure 1: The Internet content transcoding system adapts the content to the capabilities of the client devices.

The article describes deploying the transcoding system at a (1) proxy, (2) server, or (3) client, which in turn allows the execution of transcoding to take place respectively (1) on the fly, (2) during the content publication process, or (3) upon delivery if the client device has sufficient capabilities. *Id.* at 2. In relevant part, the article has two sections respectively entitled "Device constraints" and "Network constraints."

Under "Device constraints," the article notes that "[v]arious constraints of the device affect the selection of the content. For example, many devices cannot handle video. In this case, the corresponding content alternatives can be eliminated . . . if the device has a local storage of only 16 KB, then this places a hard limit on the total size of the versions of the content selected." *Id.* at Section 4.1.3. Under "Network constraints," the article notes that "the network would place constraints on the content selection process. In general, the network constraints introduce a trade-off between content data size and load time. For example, if the user

specifies a maximum load time for a page, then to accommodate this load time, the transcoder system must sense the end-to-end bandwidth ***to derive the target data size for the content***. Then, the system can select the content of maximum content value that is within the target data size." *Id.* at Section 4.1.4.

Finally, the article describes a real-time network-based transcoding system using transcoding proxies ("TP" in Fig. 6 below) which, in most cases, have low bandwidth connections to the internet.



Figure 6:  Network-based transcoding of Internet content using transcoding proxies (TP).

1

2

           **v.**    **John R. Smith,** *Digital Video Libraries and the Internet* **("DVL")**

3

      The DVL article's focus, as its title suggests, is the integration of digital

4

5

libraries and the internet. The article describes the various functions of digital

6

video libraries, e.g., cataloging, searching, and retrieving digital video. DVL at 2.

7

It then discusses various challenges that attend the storage, search, retrieval, and

8

9

transport of video. *Id.* at 3. Next, the article discusses "[t]he four major

10

components of digital video libraries . . . authoring, accessioning, patronage, and

11

usage of video . . . ." *Id.* at 4.

12

13

      In a section entitled "Storage," the article surveys various video coding

14

standards and carves out the distinction between MPEG-1, MPEG-2, and MPEG-4.

15

16

*Id.* at 5-6. In another section entitled "Patronage," the article describes how users

17

search, browse, and retrieve video. A subsection entitled "Transcoding" describes

18

19

the "great need for enabling device-independent access to digital video libraries

20

deployed on the Internet," citing the "growing variety of client devices with widely

21

22

varying capabilities in display, processing, storage, and communications . . .

23

gaining access to the Internet." *Id.* at 9. "Universal access to digital video libraries

24

for . . . client devices can be enabled by deploying a transcoder in a digital library

25

26

or network . . . . The transcoder allows video to be delivered in the form of images,

27

video, audio, or text, and ***at different resolutions depending on the client device***

28

***capabilities***." Smith at 95.

-27-

Figure 5 from the article, reproduced below, depicts the use of three transcoders (shown as tubes along the arrows) to deliver media in a format compatible with the respective three client devices (shown on the right).



Figure 5: Search and retrieval for digital video libraries that support interactive retrieval and content-based transcoding.

The article also describes the provision of streaming video to viewers using different devices such as "personal digital assistants (PDAs), handheld computers (HHCs), Web-enabled televisions, and smart phones." *Id.* at 96, Fig. 5. It references a known method of adapting a video to the available bandwidth by dropping the least important MPEG transform coefficients on the fly. *Id.* Finally, the article notes the variety of options for both compressing and streaming video. *Id.* at 94. The article notes that "[t]ypically, video streaming systems need to handle video transport in addition to video compression. The disadvantage of proprietary video streaming formats is the need for non-standards-based client

decoders. The use of non-standard formats often harms the accessibility of the digital video libraries that adopt these formats." *Id.* (emphasis added). The article concludes by acknowledging the need for considerable advancement in current technologies underlying digital video libraries and the Internet before the deployment of digital video libraries on the internet becomes feasible. *Id.* at 97.

### vi.   U.S. Patent No. 6,594,699 (filed Oct. 10, 1997) ("Sahai")

Sahai teaches the provision of "a system that adapts the media format to the client capabilities and adapts the streaming process according to the client capabilities and user specifications." Sahai at 2:8-11. Sahai discloses "a system in which a server processor coupled to a client processor ***receives client processor capabilities in association with a request for service for a multimedia type data transfer***. The server determines the characteristics of the transfer to the client based on the capabilities and preferences." *Id.* at 2:19-28, 5:41-45.  "In case there are a number of media assets on the server . . . for example, a video clip is stored in both MPEG1 and MPEG2 formats, the asset is chosen ***based on the client side information about the hardware and software decoders and the networking capabilities.***" Sahai at 6:15-21. Sahai also reveals that the server can choose amongst multiple possible network routes and transport mechanisms to transmit video to the client. Sahai at 6:21-29.

//

-29-

### vii.  Inouye, *System Support for Mobile Multimedia Applications*

The Inouye article notes the proliferation of streaming multimedia applications and the move toward increased system mobility, noting the widespread use of laptop computers, hand-held devices, and PDAs combined with the ready available of network access via protocols such as SLIP and PPP, and the rapid proliferation of wireless networking technology. Inouye at 1.

The article describes gathering user information to support user and device mobility and providing video servers that stream video to mobile devices which are "switching from wired LAN [local area network] to POTS [plain old telephone service] to wireless LAN, transparently adapting to new network address . . . ." Inouye at 211.

### viii.  U.S. Patent No. 5,721,815 (filed Jun. 7, 1995) ("Ottesen")

The Ottesen patent teaches a multimedia server which customizes the order of the source program segments in response to formatting and configuration parameters associated with the configuration and control functions of a subscriber's unique local set-top control system. Ottesen at 6:25-29.

### ix.  Aditi Singru & Alok Srivastava, *Framework for Interactive Video-on-Demand Service*

The Singru paper presents a design of a video-on-demand server capable of supporting a large number of video requests with complete functionality of a

-30-

remote control for each request. Singru at Abstract. The article describes a VOD server capable of satisfying multiple subscriber requests at any given time. *Id.* at 637. The article also notes that multiple users may be watching different parts of the movie at the same time. *Id.* The article devises various interleaving schemes for different scenarios of usage. *Id.* The article's VOD server provides complete functionality of a remote-control such as pause, fast-forward, and rewind.

### x.    Theodore Zahariadis et al., *Interactive Multiemedia Services to Residential Users*

The Zahariadis article describes the provision of interactive multimedia services from a residential user's point of view. The article identifies the complexity of broadband network architecture for the delivery of multimegabit data signals from centralized servers to thousands of subscribers. In the discussion of this architecture, the article identifies server-side and client-side devices. The article also discusses mobility in telecommunications and states "[U]ser mobility enables the subscriber to use ubiquitously personalized multimedia services, independent of both physical location ***and terminal equipment***." Zahariadis at 64 (emphasis added). In the context of user mobility, the article discusses the necessity of a universal personal numbering plan for access validation. *Id.* Though the article mentions, as indicated above, the possibility of different types of terminal equipment, it states that "it is unlikely that the STB-TV (set-top box television) and PC will converge in the next few years." *Id.* at 66.

-31-

### b.  The differences between the prior art and the claims at issue

The Hanson and Goode references disclose bookmarking. The Sahai patent and the two Smith articles collectively disclose the delivery of media in a format compatible with device properties like device type, acceptable media format, and properties of the communications link. No single prior art reference *combines* bookmarking with transcoding or delivering format-compatible media to a different device.

By contrast, the independent claims of the '906 patent differ from the prior art in that they ***combine*** bookmarking ***with*** the delivery of media in a format compatible with properties of client device (such as device type, acceptable media format, and communications link speed and reliability) ***to solve a new problem***: permitting the same user to resume watching a program on a different type of device than on which he or she began.  Opp. at 5-6.

### c.  The level of ordinary skill in the pertinent art

The Court finds that a person of ordinary skill in the art at the time of filing of the '906 patent would have been an Engineer with a Bachelor's Degree in Electrical Engineering or Computer Science (or equivalent field), with two to four years of experience developing systems for the delivery of media files to consumers, or equivalent training and experience.

//

-32-

#### d.  Secondary considerations of nonobviousness

The prior art lacks evidence of commercialization of the '906 patent prior to its creation. Opp. at 23. Hulu, Best Buy, and Google specifically promote the feature covered by the '906 patent. Opp. at 23 (citing Novikov Decls. Exs. B, C, D). Rovi states that with further discovery it will be able to show additional evidence that the accused Hulu products have been commercially successful due, in part, to use of the '906 technology. Rovi is unable to present this evidence at present because, it argues, Hulu did not produce important categories of discovery such as financial information and 30(b)(6) witnesses. Opp. at 24.

### 2.  Legal Determination of Obviousness

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007). Though the Supreme Court in *KSR* restored the recourse to flexible concepts like common sense to determine obviousness when it rejected the Federal Circuit's rigid application of the teaching-suggestion-motivation test, the Supreme Court also noted the importance of identifying "***a reason*** that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.* (emphasis added). "This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed

discoveries almost of necessity will be combinations of what, in some sense, is already known." *Id.* at 418-19.

In fact, under *KSR* this Court *must* provide an explicit analysis to determine whether there was an apparent ***reason to combine*** the known techniques of bookmarking and transcoding. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007) (emphasis added) ("Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent ***reason to combine*** the known elements in the fashion claimed by the patent at issue. ***To facilitate review, this analysis should be made explicit***.") (emphasis added).[6]

Even where common sense supplies the reason to combine, the Court cannot invalidate a patent as obvious on the basis of conclusory statements; there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness. *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (rejecting as generic an expert's testimony that "[t]he

---

[6] *See* Jason Rantanen, *The Federal Circuit's New Obviousness Jurisprudence: An Empirical Study*, available at http://ssrn.com/abstract=2210049 (last accessed on February 4, 2013) (chronicling the post-KSR transition of Federal Circuit obviousness jurisprudence from the rigid form of the TSM test to the more flexible "reason to combine" inquiry).

-34-

motivation to combine would be because you wanted to build something better . . . more efficient, cheaper . . . more features . . . more attractive to your customers . . . something new that hadn't been able to do before.") . "[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* But "[t]he mere recitation of the words 'common sense' without any support adds nothing to the obviousness equation." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012).

In its anticipation analysis, the Court rejected Hulu's argument that Goode *expressly or inherently* disclosed delivering media configured in accordance with device properties using different communication links. *Supra* at 16. Under Goode, *any* device able to or adapted to "function as an information receiver and/or transmitter" is an eligible set top terminal. Goode at 20:8-18. Furthermore, Goode places *no explicit restrictions* on the relationship between multiple set top boxes used in one environment, i.e., by one user. Given the plurality of set top terminals disclosed (device mounted within display device, device mounted without display device, application specific integrated circuit, general purpose computer, other device), and given the absence of any limitation in the specification to using "two of the same" devices for a two-set-top-terminal environment, it is reasonable to find that under Goode, the two set top terminals for one user could be identical or

different. But that does not say anything about configuring media in a format *compatible* to or "consonant with the properties of the client device which can include device type, acceptable media format, and communication link speed and reliability." '906 at 5:27-29.

For example, what if a device were able to function as a transceiver for *one* type of media format or communication link speed but *not for another*? Under Goode, such a device would be simply ineligible to serve as a set top terminal on account of its incompatibility with the delivered device. For Goode contains no disclosure of any step to compensate for incompatibility by transcoding or converting the media into a format compatible to the terminal device. Goode discloses devices "***adapted to*** function as an information receiver and/or transmitter." Goode at 20:17-18. But this instance of the word "adapted" most reasonably means adding functionality to a generic device (such as a laptop computer) to serve as a transceiver; not to integrate a transcoder or similar format-compatibility mechanism into each device. Hulu's argument amounts to this: if it works with different devices, it must be format compatible. Not so. Especially where, as here, the Goode reference lacks any mention of the word "format,"[7] let alone the word "compatibility."

---

[7] To be sure, the Goode patent does feature one instance of the word "format." "The method 1100 then proceeds to task 1125, where the display control unit rasterizes the [list of active titles] (i.e., converts the list of titles into a displayable format) . . . ." Goode at 18:23-25. But this has to do with the format of the displayed list of active titles. Not the format of the media file adjusted for the displayed device.

Perhaps, as Rovi's expert opined, "there is no need for identifying device properties prior to media transmission in Goode because the device properties are all the same *because the devices are all supplied by the cable company in the first place*." Extending this to generic devices which can be "adapted" to serve as transceivers, perhaps the "adaption" is limited to same-format adaptation. The lack of necessity of format conversion or compatibility assurance was a result, perhaps, of the "closed" nature of the cable providers' system. *See* Kramer Decl. at 14.

The *closed* cable system surrounding cable content in Goode, which teaches bookmarking, stands in stark contrast to the *open* systems surrounding internet content delivery disclosed in the Smith references, which teach transcoding. The '906 appears to be the first reference of its kind to *recognize the reason to combine* the Smith reference's teachings with respect to transcoding with the Goode's teachings with respect to bookmarking and to *devise a media-on-demand solution* which integrates bookmarking with transcoding. At the time of the invention of the '906 patent, as Rovi's expert opined, the cost and technical constraints facing cable companies were a lot different than today. Kramer at 15. Implementing Smith's teachings in Goode's cable content system would have entailed overhauling infrastructure, costs of which could have exceeded the accompanying benefits. For example, it could have involved deploying transcoders in cable boxes, servers, or proxies, or storing media in various formats to account for compatibility in across

-37-

devices, formats, links, etc. But "the whole point of the cable business was that, once you had strung the cable on a given street or neighborhood, you had a structural monopoly and could *prevent* competition." Kramer at 14.

In addition, the limited bandwidth available over the internet in 2000 would have made the prospect of setting up an alternative media delivery system to compete with cable companies "virtually unthinkable." Kramer at 15. Indeed, prior art references indicate the magnitude of this problem for different device types and connection links. For example, the Inouye reference states, "Available network bandwidth, for example, ***drops by several orders of magnitude*** when a docked laptop is disconnected from its Ethernet-based LAN and must continue operation via a PPP-based cellular modem connection." Inouye at 1-2. Though Goode's set-top terminals *include* laptops adapted to function as transceivers, Hulu cannot argue that Goode prescribes any mechanism for recalibrating the format of the video to account for ***drops by several orders of magnitude***. Goode simply says – deliver the media. The '906 patent, on the other hand, accounts for device properties *including the speed and reliability of the communication link*. Put another way, the '906 patent would recognize the several-orders-of-magnitude bandwidth drop vis-à-vis the PPP-connected laptop and would *reformat the media accordingly*. By contrast, Goode would simply try to push content through a communication link incapable of meaningfully serving the laptop.

An artisan armed with the Smith articles and the Inouye article would have been aware of the problem of limited bandwidth and the need for transcoding therein. Indeed, the Digital Video Libraries article (Smith) expressly referenced a known method of adapting a video to the available bandwidth by dropping the least important MPEG transform coefficients on the fly. *Id.* But would the artisan have acknowledged the same problem attaching to proprietary cable content of the sort disclosed in Goode? If the answer to this question is yes, the '906 patent is likely obvious. But what would the *reason* have been to disregard the incentives of cable companies, ***the controllers of their own content***, to revamp[8] their infrastructure and liberate their customers from the shackles of cable-company-provided terminals? In other words, why would cable companies want to undertake capital investments to undercut their own revenue sources by allowing customers to consume content on generic devices? Why would they drop their lucrative business model premised on controlling content and switch to the opposite business model of liberating content to the internet? To give their customers a better, more efficient, cheaper, more attractive product which was cheaper and presented something new that they had not been able to do before? Perhaps. But the Federal Circuit has already rejected these precise bases as grounds for obviousness only recently. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d

---

[8] *See* Zahariadis at 63 ("The CD-i market failure illustrates the perils of investing in the fast-moving arena of home entertainment and information. The case of interactive multimedia services is much more precarious due to the ***large investment in network infrastructure***.").

1312, 1328 (Fed. Cir. 2012) (rejecting, as generic, an expert's testimony that "[t]he motivation to combine would be because you wanted to build something better . . . more efficient, cheaper . . . more features . . . more attractive to your customers . . . something new that hadn't been able to do before.").

As a matter of logic, when the controllers of content loosen the reins over their proprietary content, artisans in that field have every incentive to scour various combinations of technologies to render a better product. But where, as here, Hulu has failed to rebut Rovi's expert's testimony that cable providers' incentives were misaligned with the teachings of the '906 patent, the Court cannot simply ignore the reality that cable providers had every incentive *to restrict* access points of content distribution to their *own* set-top terminals. Given the unique barriers to entry facing the innovation space centered on proprietary *cable* content controlled by cable providers, the artisan had no apparent reason to combine Goode's bookmarking teachings with Smith's teachings of transcoding *internet* content for heterogeneous client devices.

At one point in the oral argument, Hulu cited the Federal Circuit as having held that "[a]n unsolved problem is not evidence of nonobviousness unless skilled workers in the art have tried and failed to solve the problem." Transcript at 45:1-4. First, the Federal Circuit was only quoting the district court's basis for its own judgment. *Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361,

1377 (Fed. Cir. 2000) ("The district court found that [a]n unsolved problem . . . .").

Second, the district court itself derived that quote from its interpretation of

*Application of Allen*, 51 C.C.P.A. 809, a Court of Customs and Patent Appeals case

from 1963, i.e., a half century ago. Third, only last year, the Federal Circuit stated

that "[o]ften the inventive contribution lies in defining the problem in a new

revelatory way." *Mintz*, 679 F.3d at 1377. The Court is prohibited from "us[ing]

the invention to define the problem that the invention solves," *id.*, and then

applying *Ecolochem*'s purported "holding" to find the invention obvious because

nobody else *tried and failed* to solve it first. Otherwise, all previously

unrecognized (and not obvious to recognize) problems would be delegated, en

masse, to the public domain, merely because they bear obvious solutions. This

erodes an analytical safeguard against hindsight bias: the prohibition from defining

the problem with reference to the patented invention.

   The Court is not effectively applying the pre-*KSR* teaching-suggestion-

motivation test and "calling it something else." The transition from the rigid

application of the TSM test to the new "reason to combine" inquiry culminates in a

broader, more flexible obviousness jurisprudence wherein the Court can resort to

common sense – but only after curbing hindsight bias. Of course, the Court does

not want to overshoot the mark and effectively turn back the clock with a trivial

variant of the pre-*KSR* rigid TSM inquiry. Various safeguards are in place to check

hindsight in the post-*KSR* era. The most notable, of course, are secondary considerations, the prohibition against defining the problem with reference to the invention, and a search – with recourse to common sense – for a reason to combine prior art references, and finally – the presumption of non-obviousness that attaches to any issued patent which can only be overcome by clear and convincing evidence. This is a much more flexible jurisprudence than the rigid search for explicit evidence of teaching, suggestion, or motivation. The Court cannot invoke an unsupported assertion of common sense to summarily reject Rovi's expert testimony which, the Court finds, *is* relevant to what a person having ordinary skill in the art would have found obvious.

In the context of this motion, the Court cannot find any apparent reason for an artisan to combine the internet-content teachings of the Smith articles (transcoding) with the cable-content teachings of the Goode reference at the time of filing of the '906 patent, because of (1) significant infrastructural limitations that were only then being explored in the context of digital video libraries deployed on the internet, and (2) the misalignment of the incentives of media-on-demand providers like cable providers, who control the distribution of their content, with the teachings of the '906 patent. The mere potential of the internet to change the distribution paradigm of proprietary content  is not apparent reason enough to

place the combination of the teachings of the Smith articles (transcoding) and those of Goode (bookmarking) into the public domain.

Hulu's summary judgment motion on obviousness with respect to the '906 patent is, therefore, denied.

## V.   Conclusion

The Court's anticipation and obviousness rejections attach to independent claims of the '906 patent. As such, these findings transmit to the dependent claims which only contain further limitations pertaining to server architecture. Consequently, Hulu's summary judgment motion of invalidity as to the asserted claims of the '906 patent on grounds of anticipation and obviousness is **DENIED**.

**IT IS SO ORDERED.**

DATED: February 5, 2013

_Mariana R. Pfaelzer_

_____

Hon. Mariana R. Pfaelzer
United States District Judge